

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-26-2005

# USA v. Naranjo

Precedential or Non-Precedential: Precedential

Docket No. 03-4759

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"USA v. Naranjo" (2005). *2005 Decisions*. Paper 461.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/461

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-4759

_____

UNITED STATES OF AMERICA,

v.

ADOLFO NARANJO,
                    Appellant

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(Crim. No. 03-CR-00253-1)
District Judge: Hon. James T. Giles

_____

Argued: January 18, 2005

Before: ALITO, McKEE and SMITH,
Circuit Judges.

(filed: September 26, 2005 )

_____

Attorneys for Appellant
MAUREEN KEARNEY ROWLEY
Chief Federal Defender
DAVID L. McCOLGIN
Supervising Appellate Attorney
ELAINE DeMasse (Argued)
Assistant Federal Defender
Federal Court Division
Defender Association of Philadelphia
Suite 540 West - Curtis Center
Independence Square West
Philadelphia, PA 19106

Attorneys for Appellee
PATRICK L. MEEHAN
United States Attorney
LAURIE MAGID
Deputy U.S. Attorney for Policy and Appeals
ROBERT A. ZAUZMER
Assistant U.S. Attorney
DAVID E. TROYER (Argued)
Assistant U.S. Attorney
615 Chestnut Street
Philadelphia, PA 19106

_____

OPINION

McKEE, Circuit Judge.

Adolfo Naranjo asks us to determine whether the District Court erred in denying his suppression motion based upon the investigating agents' failure to give *Miranda* warnings before obtaining an inculpatory custodial statement. He also appeals the District Court's denial of his request for a minor role reduction in his sentence. For the reasons that follow, we will reverse and remand the case to the District Court for further proceedings consistent with this opinion.

## I. Factual Background.

In February 2003, Naranjo appeared at the Philadelphia warehouse of Banocol Marketers. Banocol is headquartered in Columbia, but imports and distributes produce in the United States. Naranjo arrived unannounced and informed the company's vice president, Sander Daniel, of his desire to purchase plantains for resale in New England. App. 287a - 295a.

Daniel was suspicious because Naranjo appeared unannounced and because of his apparent inexperience with ripening, importing, and distributing produce. Naranjo also lacked industry credentials and credit. Accordingly, Daniel contacted U.S. Immigration and Customs Enforcement agents, and Customs began investigating Naranjo.

Utilizing cellular telephone records, the agents learned

that Naranjo lived at 1949 Pratt Street in Philadelphia, Pennsylvania, and they placed that location under surveillance. During the course of their surveillance they confirmed cellular telephone conversations between Naranjo and Estaban Correa, who lived at 444 Spencer Street in Philadelphia, Pennsylvania. App. 73, 102.

In early March, Banacol provided Naranjo with two shipments of plantains. He resold them in Philadelphia, rather than in New England as he had initially proposed. After taking delivery of those shipments, Naranjo ordered 96 boxes of plantains from Banacol. They arrived in Philadelphia as part of a larger shipment on March 17, 2003. On March 18, 2003, Customs agents investigated the shipment with the aid of a drug detection dog. The dog "alerted" to one of the boxes, thereby suggesting that the box contained a controlled substance. Upon opening it, agents found approximately six kilograms of cocaine inside. The agents seized the cocaine, replaced it with sham cocaine, and also placed a transponder inside the box. The transponder allowed them to track the box and signal when the box was opened.

Naranjo picked the box up on March 19, 2003, and Banacol employees loaded it onto his truck at the direction of undercover Customs agents. Later that day, Naranjo drove to a grocery store and unloaded a box with the help of Correa, who trailed Naranjo to the store. Within an hour, agents saw Naranjo's white truck at Correa's residence, and the two were observed looking through some boxes of plantains in the back of Naranjo's truck. Agents then saw Naranjo carry a box of plantains into the house, accompanied by Correa and his

4

girlfriend, later identified as "Marguerita Orrego."

At this point, agents knew from signals they were receiving from the transponder that the box of sham cocaine was in Correa's residence. Shortly thereafter, Naranjo and Correa left the house and drove away in Naranjo's truck. Naranjo was later seen entering his residence on Pratt Street, and he remained there until the following morning.

Later that evening, after Correa, Orrego, and another woman left the Spencer Street residence, the transponder tone changed, indicating that the box of sham cocaine had been opened. When Correa and Orrego returned to 444 Spencer Street, they were approached by agents who informed the two of the investigation and accompanied them into the residence. Once inside, agents found a Banacol box of plantains and the transponder inside the kitchen; the sham cocaine was no longer in the box.

On the morning of March 20, 2003, Customs Agent Michael Rodgers and approximately eight other agents converged on Naranjo as he left his Pratt Street residence and attempted to enter his truck. Speaking in Spanish, Rodgers identified himself and the other agents as police, and told Naranjo to "put his hands up" and get out of the truck.[1] App.

---

[1] Rodgers testified that he wanted to "make sure that my safety along with [Naranjo's] safety was carried out to the furthest. I just wanted to make sure that [Naranjo] absolutely knew who we were immediately, that way there was no

5

101a. Rodgers' gun was drawn as he approached Naranjo. App. 341a. Naranjo's hands were then placed on the side of the truck, and he was searched. Approximately $900 in cash was seized from his pocket, and he was then handcuffed and searched.[2]

Agent Rodgers then asked Naranjo if they could enter the residence, and Naranjo consented. After entering, Naranjo told the agents that he lived on the second floor and lead them to his one room apartment. He gave them the key, and the agents obtained Naranjo's permission to search it. During the search, agents told Naranjo that he had been under surveillance for a couple of days. Agent Rodgers then told him: "I'm going to be straight up with you, if you'll be straight with me. You're not under arrest at this point. I just wanted to —I want to know if you'll talk to us." App. 116a. Rodgers also told Naranjo that he

_____

confusion. I just didn't want anybody to get hurt. . . ." He also testified that they did not tell Naranjo that he was not under arrest when they approached him and asked him to put his hands up. App. 102a.

[2] Since Rodgers testified that agents "still had their weapons drawn, but after the search was conducted . . .they put their guns away and no guns were not taken out for the rest of the day," it appears that agents besides Rodgers had their weapons drawn as they converged upon Naranjo. However, the District Court did not make any specific finding in this regard. Moreover, that fact does not alter our analysis since it is clear that the interrogation that followed was custodial for *Miranda* purposes. App. 342a.

did not have to speak to the agents or "answer any of our questions." App. 116a.

Rodgers then took Naranjo downstairs to an enclosed porch where Naranjo sat, still handcuffed, on a foam mat. They were joined by Special Agent Fleener and possibly others, and Naranjo was again asked if he was willing to answer their questions. The agents reiterated that he did not have to answer questions, and that he could instead remain silent. Naranjo agreed to speak with the agents, and they began questioning him about his activities the previous day.[3] Naranjo apparently incriminated himself in the importation of cocaine through Banocol Marketers. While they were questioning Naranjo, other agents who were present told Agent Rodgers that they had received authorization to arrest Naranjo that day. At the same time, the agents agreed to Naranjo's request to go to the bathroom. According to Agent Rodgers, when Naranjo returned from the bathroom, he told them he wanted to "speak more," but agents stopped him and gave him *Miranda* warnings.[4] App

---

[3] Naranjo also talked about other things, including his family and his time in Columbia.

[4] *See Miranda v. Arizona,* 384 U.S. 436 (1966). The transcript of the suppression hearing is actually a bit confusing as Agent Rodgers' testimony suggests that he first remembered to warn Naranjo after Naranjo returned from the bathroom; however, the agent also testified that his decision to warn Naranjo at that point stemmed from the fact that it was then apparent that Naranjo was going to be arrested. App. 177a.

123a., 126a.

After the warnings were given, Rodgers asked Naranjo if he was willing to waive his rights and answer questions without an attorney being present. Naranjo stated that he was, and Agent Rodgers then gave him two forms. One form outlined the rights that had just been read. The other was a waiver form indicating that he wished to waive those rights. Naranjo was given both forms to sign. Agent Rodgers and at least one other agent who was present then signed both forms to indicate that they had witnessed Naranjo's signature on each one. However, it is not disputed that Naranjo signed only the advice of rights form. He never signed the waiver form.[5]

Before Naranjo received his *Miranda* warnings, he told the agents he had seen Correa open the box with the sham cocaine, there was a mark on the box, the box contained "breathing holes," and when the box was dropped on the floor, he could see three white bags. App. 132a-133a. After receiving the warnings, Naranjo told Agents that the three packages he saw could have been cocaine, Correa told him the packages contained three kilos of cocaine, and a male was going to come for them from the Spencer Street address. He also told the agents that he had been arrested for drugs in Colombia and served twenty months in prison. App. 132a-133a.

---

[5] Agent Rodgers explained that Naranjo signed the waiver form because, at the time Naranjo was given the form to sign, Rodgers was distracted and looked away when someone called his name. App. 188a.

Following the statement, Naranjo was formally taken into custody and transported to the Customs House. Upon arriving there, he refused to speak further to the agents, and they refrained from any additional questioning. He was thereafter formally charged with possession of cocaine with the intent to distribute.[6]

## II. Procedural History.

A federal grand jury returned an indictment charging Naranjo with possession of cocaine with intent to distribute, and attempted distribution of 6.75 kilograms of cocaine in violation of 21 U.S.C. §§841(a)(1), and (b)(1)(A).

Prior to trial, Naranjo moved to suppress both the statements he made to Customs agents and physical evidence seized from his apartment. The government conceded that statements Naranjo gave before he was "Mirandized" would not be offered at trial. However, the government maintained that the statements Naranjo made after receiving *Miranda* warnings were admissible. The District Court denied Naranjo's motion after a hearing. The court concluded that Naranjo "wanted to talk [to the agents] and did," that Naranjo was handcuffed during the entire interrogation but comfortable, that "he was talkative," that he understood the *Miranda* warnings once they were given, that he knew that he did not have to make any

---

[6] On April 12, 2003, customs agents returned to the Correa residence at Spencer Street where they recovered the sham cocaine from behind a wall. App. 112-116.

statements, that he was aware of his right to counsel after he was warned, and that his waiver of his *Miranda* rights was knowing and voluntary." App. 256a. The court concluded that Naranjo believed that the "agents had connected him through their own observations with the transport of cocaine and the delivery of cocaine or at least, what he believed to be cocaine." App. 257a.[7]

The case then proceeded to trial, and Naranjo was convicted on both counts of the indictment. The presentence investigation report ("PSR") introduced at sentencing held Naranjo accountable for 6.017 kilograms of cocaine and assigned a base offense level of 32, PSR ¶ 17, and a criminal history category of I, PSR ¶ 29.[8] Naranjo objected to the PSR arguing that he should receive a minor role reduction. The court rejected that argument and sentenced him to 121 months imprisonment. This appeal followed.

## III. Discussion.

### A. Suppression of Post-*Miranda* Statements

We review the District Court's factual findings during the

---

[7] The court also concluded that Naranjo voluntarily and knowingly consented to the agents' search of his room. Naranjo does not contest that ruling.

[8] For sentencing purposes, the jury unanimously found that the amount of cocaine he was responsible for was more than five kilograms.

suppression hearing for clear error. We exercise plenary review over the court's legal rulings. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

The government concedes that Naranjo was in custody when first interrogated by the agents on the enclosed porch. Accordingly, it is clear that *Miranda* warnings should have preceded that interrogation. *See Miranda v. Arizona,* 384 U.S. 436, 444 (1966). As noted above, the government agreed not to use the pre-warning statement at trial, and the suppression hearing therefore only addressed the post-warning statement. However, Naranjo argues that the post-warning statement "was merely the conclusion of a single seamless statement," and that the "post-warning portion makes little sense unless considered in conjunction with the preceding part of the statement." Appellant's Br. at 23

The government notes that "only [the] last portion [of his statement] was offered into evidence at trial," and argues that this portion was the result of a voluntary, intelligent and knowing waiver of *Miranda* after Naranjo had been properly warned. Appellee's Br. at 15.

> In *Miranda*, the Supreme Court proclaimed:
> [W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.

11

394 U.S. at 467. A custodial statement must therefore be voluntary. "Voluntariness" encompasses all interrogation practices likely to pressure a suspect to such an extent that he/she is precluded from making a free and rational decision about abandoning the protections of the Constitution and giving statements to police. *Id*. at 464-465.

A more difficult constitutional problem is posed where, as here, the dictates of *Miranda* are obeyed only after a suspect has already made incriminating statements to investigators. When that happens, in the absence of coercion, it is necessary to determine if the intervening warnings were sufficient to inform the suspect of his/her rights so that the suspect could properly decide whether or not to waive the protections of *Miranda* and make statements to police. *Oregon v. Elstad*, 470 U.S. 298 (1985). The inquiry therefore focuses on whether the rights were knowingly and intelligently waived.

In *Oregon v. Elstad*, the Supreme Court had to determine the admissibility of a custodial statement that police obtained only after they had first questioned a suspect without administering *Miranda* warnings. The suspect gave the first statement when police went to his home with an arrest warrant. After the suspect's mother led the officers to her son's room, they spoke with him and told him that they thought he was involved in the burglary of a neighbor's home. He responded by saying, "Yes, I was there." *Id*. at 301. He was then taken to a patrol car and transported to the Sheriff's Office where he was given proper *Miranda* warnings. He then told police that he understood his rights and that he "wished to speak with the officers." *Id*. He then gave a full statement that he subsequently

12

reviewed and signed.  Following his conviction for burglary, he appealed the trial court's denial of his motion to suppress both his unwarned oral statement and his written statement given after receiving *Miranda* warnings.  "He contended that the [unwarned] statement he made in response to questioning at his house 'let the cat out of the bag,' and tainted the subsequent confession as 'fruit of the poisonous tree.'" *Id*. at 302 (citations omitted).

The trial court had suppressed the initial statement, but allowed the second statement into evidence after concluding it "was given freely, voluntarily and knowingly by the defendant after he had waived his right to remain silent and have counsel present." *Id*.  The state appellate court reversed. In that court's view, the relevant constitutional inquiry was "'whether there was a sufficient break in the stream of events between [the] inadmissible statement and the written confession to insulate the latter statement from the effect of what went before.'" *Id*. at 303 (brackets in original).  Given that court's analysis, the voluntariness of the second statement was irrelevant. The court reasoned that, "[r]egardless of the absence of actual compulsion, the coercive impact of the unconstitutionally obtained statement remains, because in the defendant's mind, it has sealed his fate." *Id*. The state appeals court reasoned that the brief period between the two statements was simply not sufficient to dissipate the coercive impact of the first statement because "the cat was sufficiently out of the bag to exert a coercive impact on [respondent's] later admissions." *Id* (brackets in original).  The Supreme Court granted *certiorari* to determine if "[t]he Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda*

13

warnings and a valid waiver of rights solely because the police had obtained an earlier voluntary but unwarned admission from the defendant." *Id*.

In holding that suppression was not required, the Supreme Court explained why the appropriate inquiry was not advanced by resort to metaphors such as "the cat was out of the bag" or "the fruit of the poisonous tree."[9]  *Id*. at 303-06. We have summarized the holding in *Elstad* as follows:

> [I]t was an unwarranted extension of *Miranda* to hold that a simple failure to administer warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Reinert v. Larkins*, 379 F.3d 76, 90 (3d. Cir. 2004) (internal quotation marks omitted). Accordingly, in *Elstad*, the transgression did not mandate automatic exclusion of the post-warning statement.  The Court explained that the "failure of police to administer *Miranda* warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently waived." *Elstad*, 470 U.S. at 310.  However, an unintelligent waiver is not the same

---

[9] *See Wong Sun v. United States,* 371 U.S. 471 (1963).

thing as a coerced statement. Thus, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id*. at 314.

Thus, where the statement is voluntary but made without the benefit of proper *Miranda* warnings, "[a] subsequent administration of *Miranda* warnings . . . should suffice to remove the conditions that precluded admission of the earlier statement. In that case, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id*. In examining the totality of the circumstances surrounding *Elstad's* two statements, the Court noted that "[n]either the environment nor the manner of either 'interrogation' was coercive[.]" *Id*. at 315. The initial interview took place during the middle of the day, in the "living room area" of Elstad's home and his mother was in the kitchen "a few steps away." Moreover, although the state conceded that Elstad was technically in "custody" for *Miranda* purposes, police had not informed him of that fact. In fact, police had stopped briefly in his living room not to interrogate him, "but to notify his mother of the reason for his arrest." *Id*. at 315. The Court also noted that the initial failure to warn had been inadvertent, and none of the officers had exploited the unwarned statement "to pressure [him] into waiving the right to remain silent." *Id*. at 316.

Elstad insisted that the initial failure to warn could only be cured by an additional warning informing him that his prior statement could not be used against him. The Court readily dismissed that argument because such a requirement was

15

"neither practicable nor constitutionally necessary." *Id*. at 316.[10] Nevertheless, the Court emphasized that it was "in no way retreat[ing] from the bright-line rule of *Miranda*." *Id*. at 317. The Court was not implying that "good faith excuses a failure to administer *Miranda* warnings," nor was the Court condoning "inherently coercive police tactics or methods offensive to due process . . . " *Id*. The Court also refused to establish a set formula for enforcing the "bright-line rule of *Miranda*." Rather, the Court proclaimed, "far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda*, was voluntary." *Id*. at 318. Thus, "courts must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Id*.

After *Elstad* was decided, the Supreme Court addressed a similar problem in *Missouri v. Seibert*, 542 U.S. 600, 124 S. Ct. 2601 (2004). That case was decided after the District Court denied Naranjo's suppression motion here, and the court therefore did not have the benefit of that analysis. In *Seibert*, the Court was called upon to determine the admissibility of unwarned statements taken pursuant to an official policy of questioning suspects without first giving *Miranda* warnings and then obtaining a second statement after administering warnings.

---

[10] The Court explained that it had "never embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness." 470 U.S. at 316.

16

The Court referred to this policy as "question first" and concluded that, "by any objective measure [it] reveal[ed] a police strategy adapted to undermine *Miranda* warnings." 124 S. Ct. at 2612.

The Court noted that,

> [t]he warned phase proceeded after only a 15-to-20 minute pause, in the same place and with the same officer, who did not advise Seibert that her prior statement could not be used against her. These circumstances challenge the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes could not have understood them to convey a message that she retained a choice about continuing to talk.

*Id*.

Seibert had participated in a plan to incinerate the body of her 12 year-old son by setting fire to her family's mobile home. Her son had died in his sleep, but she feared she would be charged with neglect if investigators learned that he had bed sores. In order to assure that she could not be blamed for leaving him unattended when the mobile home burned, she schemed to leave a mentally ill teenager she knew in the home. Another son and his friend then set fire to it. Five days after the fire, police arrested Seibert at the hospital where her son was being treated for burns.

Pursuant to their protocol, police took Seibert into

17

custody and questioned her for nearly 40 minutes without warning her. After she finally admitted her role in setting the fire, police allowed her a 20 minute break for coffee and a cigarette. The interrogating officer then turned on a tape recorder, gave her *Miranda* warnings, and she signed a waiver of rights form. She was then confronted with her prewarning statements, and she gave an inculpatory statement consistent with the statement she had given without the benefit of *Miranda* warnings.

During the ensuing suppression hearing, the interrogating officer candidly conceded that he made a "'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give warnings, and then repeat the question 'until I get the answer that she's already provided once.'" 124 S. Ct. At 2606. In examining this practice on appeal, a plurality of the Supreme Court explained, "[t]he technique of interrogating in successive, unwarned and warned phases raises a new challenge to *Miranda*." 124 S. Ct. At 2609. However, a majority of the Justices were unable to agree on how to respond to that challenge. Writing for a four-Justice plurality, Justice Souter stressed that "attention must be paid to the conflicting objects of *Miranda* and question-first. . . . The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id*. at 2609. Justice Souter explained that, just as *Miranda* requires no "'talismanic incantation[,]. . . . it would be absurd to think that mere recitation of the litany suffices . . .". *Id*. at 2609.

The threshold issue when interrogators question

18

first and warn later is . . . whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.

*Id*. at 2610. The plurality noted the differences between the circumstances surrounding Seibert's statement and Elstad's statement.

the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. In *Elstad,* it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a

19

> reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.

*Id*., at 2612. After reiterating that the circumstances did not warrant suppression of *Elstad's* statement, the Court concluded that the circumstances of Seibert's statement were "the opposite extreme. . . ". *Id*. Seibert's

> unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he . . . did not advise that her prior statement could not be used. . . . The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances

20

must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.

*Id.*, 2612. (Footnote omitted).

The plurality ruled the post-*Miranda* statement inadmissible, explaining, "[a]lthough the *Elstad* Court expressed no explicit conclusion about either officer's state of mind, it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to the warn-first practice generally." 124 S. Ct. 2612. On the other hand, the question-first protocol posed a general threat to *Miranda*. Accordingly, the Court held that Seibert's post-warning statement should have been suppressed.

Justice Breyer wrote a separate concurring opinion in which he joined a separate concurrence of Justice Kennedy. 1124 S.Ct. at 2614. Justice Breyer believed that *Miranda* warnings could only prove effective under the plurality's analysis when "certain circumstances --a lapse in time, a change in location or interrogating officer, or a shift in the focus of the questioning--intervene between the unwarned questioning and any postwarning statement." *Id.* at 2614.

In his concurring opinion, Justice Kennedy agreed that

21

the question-first policy was designed to "circumvent *Miranda*," underm[ing] the *Miranda* warning and obscur[ing] its meaning." *Id*. He also agreed with the plurality that the focus was on whether warnings in a "two-stage interview" could effectively accomplish their object. *Id*. at 2616. However, he believed that could only be determined through objective inquiry from the perspective of the defendant, and that such an inquiry applies to "both intentional and unintentional two-stage interrogations." *Id*., at 2626. Justice Kennedy would therefore have applied "a narrower test" that would apply only where "the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id*. Where the two-step interrogation was not deliberately employed as a tactic, Justice Kennedy believed that the analysis should still be governed by *Elstad*. *Id*.

Where, as in *Seibert*, no one view garners a majority of the Justices, the Supreme Court has instructed us on how to proceed. In *Marks v. United States*, 430 U.S. 188, 193 (1977), the Court explained, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the 'holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" In *Seibert*, Justice Kennedy's opinion provides the narrowest rationale for resolving the issues raised by two-step interrogations where *Miranda* warnings are not administered until after police obtain an inculpatory statement.

Accordingly, unless the agents deliberately withheld warnings, *Elstad* controls Naranjo's *Miranda* claim. If the

22

initial failure to warn Naranjo was inadvertent,

> [t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made.  As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements.   The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.

*Elstad,* 470 U.S. at 318.  "If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Siebert*, 124 S. Ct. at 2616 (Kennedy, J. concurring).  Such "[c]urative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.*  This may include an inquiry into whether or not the defendant was informed that his/her prior unwarned statement can not be used as evidence, although it's not necessary to inform the suspect of that in every instance. *Id*., at 2613.[11]

---

[11] No doubt mindful of its ruling in *Elstad* that a suspect need not be informed that the prior unwarned statement is not admissible under the circumstances there, in *Seibert*, the Court explained: "We do not [require] a formal addendum warning

Of course, as noted above, the District Court here did not have the benefit of the *Seibert* analysis. There is, therefore, no finding as to whether *Miranda* warnings were initially omitted as an interrogation technique or because of mere oversight. Although the District Court noted Agent Rodgers' inexperience, the court was not aware of the need to inquire into the factors outlined in *Seibert.* We can not assume that Agent Rodgers' omission was inadvertent or a "rookie mistake" absent a finding to that effect by the District Court. *See United States v. Stewart*, 388 F.3d 1079, 1091 (7th Cir. 2004) ("On the record before us, . . . we cannot determine whether the admission of [the defendants's] confession was improper under *Seibert,* or, if not improper under *Seibert,* whether the initial unwarned confession would flunk the voluntariness standard of *Elstad* such that the taint would carry over to the second warned confession.").

Thus, the District Court did not articulate sufficient findings to allow us to review its ruling in light of *Seibert*. As noted above, the Court in *Elstad* focused on the extent of the first interrogation, the extent to which the first and second interrogation overlapped, the personnel involved, the timing, the setting of the two sessions and their continuity. 124 S. Ct. at 2612. The answer to some of these questions is apparent from

that a previous statement could not be used . . . but its absence is clearly a factor that blunts the efficacy of the warnings and points to a continuing, not a new, interrogation."124 S.Ct. at 2613, n.7.

24

the record before us.[12]  However, the findings are not sufficient to allow for a proper review in the wake of *Seibert*. Accordingly, we will remand to the District Court for additional proceedings consistent with this opinion.[13]

## B.  Naranjo's Sentence.

As we noted above, Naranjo also appeals the District Court's failure to grant a sentencing adjustment for his minor role pursuant to U.S.S.G. § 3B1.2.  The District Court imposed sentence under a sentencing regime that assumed that the Sentencing Guidelines were mandatory.

---

[12] For example, it is apparent that both interrogations occurred on the enclosed porch, that warnings were given as soon as Naranjo returned from the restroom, and that the same group of agents were present for both statements. The court also credited testimony that Naranjo was told that he did not have to talk to the agents. The court noted, on different occasions, that Narnanjo "was talkative," and "wanted to talk." App. At 255a. It also appears, however, that Naranjo was not initially told that he had the right to talk to them only in the presence of legal counsel and that counsel would be appointed for him if he could not afford one.

[13]  On remand, it may be necessary or desireable for the District Court to reopen the suppression hearing in order to make further inquiry that will support additional findings pursuant to the pronouncements in *Seibert.*

After Naranjo was sentenced, the Supreme Court decided *United States v. Booker,* 125 S.Ct. 738 (2005). Briefly stated, "[t]he Court held that 18 U.S.C. § 3553(b)(1), the provision of the Sentencing Reform Act that makes the Guidelines mandatory, was [unconstitutional] and that it must be severed and excised [from the Guidelines]." *United States v. Ordaz*, 398 F.3d 236, 239 (3d Cir. 2005).

In *United States v. Davis,* 407 F.3d 162 (3d Cir. 2005) (*en banc*), we explained how we would resolve direct appeals of sentences imposed before *Booker* was decided when the Guidelines were to be mandatory rather than advisory. In *Davis*, we stated that where we could not determine "whether the District Court would have imposed a greater or lesser sentence under an advisory framework," prejudice in a plain error analysis "can be presumed." *Id.* at 164-65. We reasoned that, given the law of sentencing after *Booker*, "[f]ailure to remand for resentencing . . . could adversely affect the fairness and integrity of the proceedings." *Id* at 165. Thus, we concluded that defendants sentenced under the prior mandatory guideline regime whose sentences were on direct appeal at the time of the *Booker* decision should have their sentencing challenge remanded to the District Court for resentencing pursuant to the pronouncements of *Booker*.

Thus, on remand, if the District Court again denies Naranjo's suppression motion after making the findings of fact and appropriate inquiry under *Seibert,* the court may reimpose the judgment of conviction, and resentence Naranjo in light of the teachings of *Booker*.

26

## III.

For the foregoing reasons, we will vacate Naranjo's sentence and remand for further proceedings consistent this opinion.

_____