906 A.2d 495 (2006)
388 N.J. Super. 135
STATE of New Jersey, Plaintiff-Respondent,
v.
Michael A. O'NEILL, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued May 17, 2006.
Decided September 21, 2006.
Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public Defender, attorney; Mr. Kirsch, of counsel and on the brief).
Karen Fiorelli, Deputy Attorney General, argued the cause for respondent (Zulima V. Farber, Attorney General, attorney; Ms. Fiorelli, of counsel and on the brief).
Before Judges WEFING, FUENTES and GRAVES.
The opinion of the court was delivered by
GRAVES, J.A.D.
Defendant Michael A. O'Neill appeals from an order denying his motion to suppress two tape-recorded statements he made to the police. Defendant argues that the police violated his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when they allegedly used a two-stage "question-first, warn-later" interrogation technique found to be unconstitutional in Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). After reviewing the record and the applicable law in light of the contentions advanced on appeal, we affirm the order denying defendant's motion to suppress and we affirm defendant's felony murder conviction.
On April 2, 2004, the trial court held a hearing on defendant's motion to suppress. During the suppression hearing, Sergeant *496 Michelle Luster, of the Union City Police Department, testified regarding her questioning of defendant on Monday, April 28, 2003. Defendant was being detained in a holding cell at the Harrison Police Department on unrelated charges when Luster and Detective Robert Bava interviewed him beginning at approximately 3:20 p.m. Luster testified that she and Bava went to interview defendant because "there was some information that during the time of the homicide time frame that Mr. O'Neill was in possession of a handgun."
After defendant gave Luster and Bava a brief account of his activities between 11:00 p.m. Friday, April 25, and 3:00 a.m. Saturday, April 26, 2003, the period during which police believed the homicide had occurred, he was moved from the holding cell to the patrol commander's office. Luster and Bava asked defendant whether he was in the vicinity of the bar Solda Espana (where the victim, a cab driver, picked up his last fare the night he was killed), and defendant acknowledged that he had gone to Solda Espana that night to meet his friend "V" in order to buy marijuana. Defendant stated that he met V in front of the bar and they discussed the drug transaction, V then told defendant to take the next available cab and go to Sealy and Columbia Avenue in Kearny. Luster and Bava asked defendant "what he thought the reason that V told him to take the cab was." Defendant responded that "he believed that V and his friend were gonna set up the cab driver and rob him, and that he was gonna get compensated for him bringing the cab there with either money or marijuana." At that point, which was about 4:45 p.m., Bava and Luster stopped defendant and "verbally Mirandized him." Defendant then agreed to waive his Miranda rights, and he signed a waiver of rights form at 4:46 p.m.
Defendant subsequently gave two taped statements to Bava and Luster, which were recorded and played for the trial judge at the suppression hearing. At the beginning of the first taped statement, taken at the Harrison Police Department, between 5:20 p.m. and 5:50 p.m., defendant was once again advised of his Miranda rights. During his second taped statement, taken at the Hudson County Prosecutor's Office, between 8:47 p.m. and 9:17 p.m., defendant confirmed that he had been advised of his rights on two prior occasions, and he stated that he "clearly" understood his rights. But when defendant was asked if his first statement was the truth, he replied, "No .... partially, but no."
In his first tape-recorded statement, defendant denied shooting the victim, and he also denied being present when the cab driver was shot. Defendant claimed V told him to "take the next available cab you see to Seeley and Columbia and I'll look you out...." Defendant told police he tried to do what V had instructed him to do:
[V] told me, he's like, [t]ake the next available cab and I'll look you out. Looking me out, means either give me like four or five bags of weed for free, or maybe throw me 20, or 50 dollars whatever. I had a feeling he was gonna rob the guy, but he did a little more than that apparently. So I, I did what I had to do by getting in the car and taking him over and where Seeley and Columbia are in Kearny I have not the slightest clue. But the guy wanted to bring me over to the Belleville Turnpike which [is] on the border of Kearny and North Arlington. And he was gonna go past it into North Arlington and I was like, [t]urn around, turn around. That's when he made the U-turn at the Supermarket and started going up the Belleville Turnpike toward Kearny Ave[.] and *497 I got out [of] the car at Rutherford Street and Belleville Turnpike and I ran back down Belleville Turnpike, cause he was facing Kearny Avenue, so I ran the opposite direction to get a jump on him and I ran down the street.
. . . .
Q. Where'd you go after that?
A. I ran through Kearny down side streets back to my house.
Q. How far of . . . a run is that?
A. From my house to where I was. . . roughly two, three miles. So it took me a good 40 minutes to get home.
Q. What time did you get home do you know?
A. To be honest with you I don't know. It was roughly 1:30, 1:45, when I got in the cab, the cab drive took maybe 10 minutes. Then the walk home was probably maybe close to 3:00. Cause I got out the cab around 2:00 and it took me about 45 minutes to get home, cause that's a long walk. And I just went straight to the house.
During his second tape-recorded statement, however, defendant claimed that he accidentally shot the victim as he attempted to exit the victim's cab:
I told him let me out [of] the cab, cause I didn't know, he didn't know where he was going obviously, I didn't know where I was going, so I was just gonna flee on foot. As I opened the door to get out of the back passenger door, he grabbed my hand which was sitting on the seat in front of me. He said, [n]o get out [of] the cab, no get out [of] the cab you must pay. I told him, I was like, [l]isten I don't have my wallet with me (unintelligible) and guy said, [n]o, no, no I call the cops. He picked up his radio, I proceeded to pull out my chrome 40 caliber Ruger out of my right jacket front pocket. I told the guy I was like, [l]et go of me, or you're gonna wear it. The guy let go of my hand as I went to go proceed to get out [of] the car the guy mashed the gas, that threw me back, a round went off, I proceeded to run and . . . I'm not sure if, if the bullet hit him, [or] went past him. But after I fired up the round which was accidental he wound up hitting a telephone pole, I wasn't sure if he died from the bullet, died from the crash just got scared and crashed into the pole, or whatever, I just ran and tried to get away from the scene. . . . I ran up that street, I zig[-]zagged through a couple of streets. And the glove that I was wearing I dropped down a corner manhole cover, or a[g]rate I mean. I ran just made my way home. I put my, put the gun I, I just fired in a bag, put it under the mattress of the bed I was sleeping on. And Sunday afternoon I wound up going out with my friend to the mall, when I got back from the mall the lady I was staying with told me I wasn't welcomed in her house, because she found out about the pistol.
Defendant did not testify at the suppression hearing, and the trial court's reasons for denying defendant's motion to suppress included the following:
THE COURT: [Y]ou make it sound as if the police are surprising your client and the facts as testified to by the witness indicate the opposite. They did display a jacket and hat to him and apparently made known what they thought it would reveal, but it was your client according to the testimony  the only testimony I have who said, you got me, I shot him, it was an accident. He clearly understood at that point prior to any second statement that he was admitting culpability in a shooting.
MR. DELL'ITALIA [Defense Counsel]: . . . I understand that, Your *498 Honor, but then  on that my point is that then they go on to question him and take a second statement.
THE COURT: Right. Exactly, sir, but in  prior to getting into the facts of that statement they remind you, which I think is even going beyond what they're obligated to do under the circumstances, they remind that he had five hours previously been given his rights and asked him if he understood them and your client's response is just telling, I understand `em clearly. He didn't  he didn't mumble yes.
. . . .
[T]here's no requirement that once having been given his rights that he be reminded in detail by a specific recitation. The issue before me is did he  was he aware prior to the taking of the statement that he had rights and exactly what those rights are, that's the key to Miranda, did he know what his rights are and if he knew what his rights were, did he voluntarily waive them.
So there's no question that he knew what his rights were. The paperwork submitted by the Prosecutor's Office indicates that he was given perfectly acceptable legal Miranda warning[s] prior to the first formal statement. In his second statement he acknowledges that he received them and that he understood them clearly and wished to give a statement.
To me that's clearly and convincingly establishing more so beyond a reasonable doubt that he was aware of his rights at the time he . . . chose to waive them prior to the second statement. There's no formal requirement that . . . he be re-Mirandized after . . . giving no indication that he was anything other than perfectly willing to waive them, which in this case he was. If you listen to the first statement . . . [the officer's] questions are very short and [defendant] is quite verbose, it's his voice filling up 90 percent of the tape.
Defense counsel then asked the trial judge this question:
Oh, and I understand on the first one, but my point is [does] the first [statement] differ[] from the second one, because the second one . . . places [defendant] involved in it and the question is, you know, . . . should he have been read his rights the second time, that's my question to the [c]ourt.
The trial judge responded:
[N]o, there's no legal obligation on the part of the State to go over with specificity his Miranda rights and they are quite sufficient. They weren't even required to make reference back to it. You were talking  you know, if this happened two or three days later or if there had been some substantial break in the interrogation process, then perhaps your argument might have some weight, but this is a continuous series of investigative acts that start  that only cover a five hour time span, six hour time span. He was advised formally, completely in writing less than five hours before this second statement. But to their credit before they took the statement they once again draw his attention to the previous[], perfectly acceptable Miranda warnings that he got and made sure that he understands them and then ask him, when he says clearly, they say will you then answer our questions and he says yes, so there's no question he was aware of his rights at the time he gave the second statement and voluntarily waived them. So your application to suppress the statement is denied.
At defendant's trial, Detective Kenneth Kolich of the Hudson County Prosecutor's Office testified that he was paged during the early predawn hours of Saturday, April *499 26, 2003, to respond to a crime scene at the intersection of Sealy and Argyle in Kearny. When he arrived at the intersection he saw a cab smashed into a telephone pole and the driver, a man later identified as Luis Tenezaca, dead behind the steering wheel. The medical examiner determined that Tenezaca died from a single gunshot wound to the head. A spent shell casing was recovered from the interior of the cab. Although Kolich did not find Tenezaca's wallet, which contained $110, it was later found in the driver's side door of the cab by Sergio Eras, one of the Tenezaca's co-workers.
At the time of the shooting, defendant had been living in Harrison with Edward and Deborah Noack, the parents of his friend, Michael Noack, who was in the Hudson County jail because he was unable to post bail on a pending, unrelated charge. Deborah Noack testified that defendant was at her home on Friday, April 25, 2003, when she returned from work at about 11:00 p.m., but she had no idea what defendant was doing after she went to bed sometime between 12:00 a.m. and 12:30 a.m. Mrs. Noack testified that she woke defendant up at about 11:00 a.m. on Saturday, April 26, 2003, because she needed him to baby-sit her grandchildren.
On the evening of Sunday, April 27, 2003, Deborah Noack received a phone call warning her that there was a gun in her house. Noack searched the room where defendant was staying and found a gun in a plastic bag under the mattress. After showing the gun to her husband, Mrs. Noack called the Harrison Police, but they never came to her home to investigate. Defendant later returned to the Noack's home and Mr. Noack "went crazy on" defendant, ordering him to pack his belongings, especially the gun, and to leave the Noack's home. According to Mrs. Noack, defendant grabbed her son's book bag which she believes contained the gun, and, as he left the house, he said "I'm getting rid of this." Defendant returned about fifteen minutes later with an empty book bag. He then packed his clothes and left the Noack's home.
Michael Noack testified at trial that when he spoke to defendant on the telephone on Friday, April 25th, defendant told him that he planned to commit a robbery in order to raise bail money for Noack. According to Noack, defendant stated that he intended to use a .40-caliber silver and black colored Ruger, and that defendant called the gun a "ratchet" in case the call was being recorded.
Noack also testified that defendant called him the next day and told him that he had taken a "round trip" in a cab to rob the driver, and defendant admitted to Noack that he had shot the cab driver:
Q. Did the defendant tell you if there was a conversation between him and the cab driver?
A. Yes.
Q. What did he say the conversation was about?
A. He said the conversation [was] about  that he wanted the money and the cab driver said, you don't have the balls to shoot me. And Mr. O'Neill said, yeah, you want to make a bet, and he pulled the trigger.
Q. Did he tell you anything about the blood in the cab?
A. That it went everywhere. On him, on the window, on the seats.
Q. Did he tell you anything about the clothing that he was wearing?
A. All black.
Q. Did he specifically say what kind of jacket or whose jacket?
A. No. But I'm pretty sure it was my jacket because he wore my clothes when I was locked up.
*500 According to Noack, defendant stated that immediately after he shot the cab driver, "all the lights on the street went on," and defendant then ran away without taking the cab driver's money. Noack also testified that defendant told him that he wore gloves during the shooting so that he would not get gun residue "on his arms."
Defendant was arrested on unrelated charges by Harrison police on Monday, April 28, 2003. After defendant had given the two tape-recorded statements to Sergeant Luster and Detective Bava, he was transported from the Hudson County Prosecutor's Office to the Hudson County jail by Detectives Mueller and Whipple. The officers testified that during the ride to the jail, defendant asked whether it was true that the victim was shot in the back of the head. When Mueller said it was, defendant replied, "Oh, I'm not surprised because that's where I was aiming."
While incarcerated, on May 7, 2004, defendant wrote a letter to his ex-girlfriend, in which he admitted to shooting the victim. He alleged that he tried to leave the cab without paying and that the victim grabbed his arm. In an effort to get away from the victim, defendant claimed, he pulled out the gun and pointed it at the victim's head. He claimed that the gun went off accidentally when the victim hit the gas, which threw him back in the seat, as he attempted to get out of the car.
The medical examiner, who conducted an autopsy on the victim, found "stippling" marks on the back of the victim's head. These, he explained, are tiny pinpoint marks that occur when a gun is discharged at very close range to the skin. They are caused by the impact of unburned gun powder hitting and burning the skin. The evidence of stippling showed that the gun was no more than eighteen to twenty inches from the victim at the time he was shot.
Defendant testified in his own defense. His testimony was similar to his second taped statement and his letter to his ex-girlfriend:
Q. Was any part of your body out of the car?
A. No, not at the moment.
Q. Okay. What happened after you opened the car door?
A. I was sort of leaning back in the seat, like slouched with my hand on the front passenger seat. When the car rolled to a stop, I opened the door and was going to turn. That's when he turned around and grabbed my arm off the passenger seat.
Q. Okay. What happened next? What, if anything, did he say?
A. He said, you don't leave.
Q. And what did you say?
A. I was like, "Get off of my arm, get off of my arm."
Q. What happened next?
A. And he was like, you no leave, I call police here.
Q. And what happened next?
A. I pulled out the gun on him to intimidate him.
Q. Now when you pulled out the gun, how did you pull it out? Where was it?
A. It was in my right, front jacket pocket.
Q. Okay. And how did you pull it out?
A. I pulled it out with my right arm  my right hand.
Q. Okay. What did you do with it when you pulled it out?
A. When I pulled it out, I cocked it back and pointed it at him and I was like, let go of my arm.
Q. What happened next?

*501 A. He let go of me. He said something. He mumbled something under his breath. As I proceeded to get out [of] the car, I kept the gun pointed at him. When I turned to get out [of] the car, he hit the accelerat[or] to get out. And as he hit the accelerator, my body was turned to leave through the door. When he hit the gas, it threw me in the backseat. A round went off and I jumped out [of] the car, and I ran back down toward Seeley Street, which was the stop sign that we just passed.
Q. Where did you go from there?
A. I just ran through the side streets back home.
Defendant also told the jury he did not intend to shoot the cab driver, Mr. Tenezaca, and he did not intend to rob him or to "beat the fare." Defendant explained that he got out of the cab without paying because:
[T]he trip was supposed to go from the bar to Columbia Street to meet Vic, then from Columbia street back to my house. He never took me to Columbia Street, so I didn't have the opportunity to sell the pistol and get the cab fare money that I was going to pay him [with].
Defendant testified that when he spoke to Michael Noack on Friday, April 25, 2003, he told him "about the pistol and asked him how his charges were going," but he denied telling Noack about the shooting. And defendant claimed that there was no discussion about the shooting while he was being transported to the Hudson County jail by Detectives Mueller and Whipple.
Defendant now claims:
There can be no doubt in this case that "custodial interrogation" triggered a need for warnings under Miranda. Defendant was, according to the police testimony, in custody and interrogated for 95 minutes prior to receiving warning. Thus, the pre-warning statements made by defendant during that time clearly were properly withheld from evidence by the State. But the post-warning statements were also inadmissible, according to . . . Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, [159 L.Ed.2d 643] (2004).
The pertinent facts of Seibert were succinctly summarized by the Third Circuit Court of Appeals in United States v. Naranjo:
Seibert had participated in a plan to incinerate the body of her 12 year-old son by setting fire to her family's mobile home. Her son had died in his sleep, but she feared she would be charged with neglect if investigators learned that he had bed sores. In order to assure that she could not be blamed for leaving him unattended when the mobile home burned, she schemed to leave a mentally ill teenager she knew in the home. Another son and his friend then set fire to it. Five days after the fire, police arrested Seibert at the hospital where her son was being treated for burns.
Pursuant to their protocol, police took Seibert into custody and questioned her for nearly 40 minutes without warning her. After she finally admitted her role in setting the fire, police allowed her a 20 minute break for coffee and a cigarette. The interrogating officer then turned on a tape recorder, gave her Miranda warnings, and she signed a waiver of rights form. She was then confronted with her prewarning statements, and she gave an inculpatory statement consistent with the statement she had given without the benefit of Miranda warnings.
During the ensuing suppression hearing, the interrogating officer candidly conceded *502 that he made a "`conscious decision' to withhold Miranda warnings, thus resorting to an interrogation technique he had been taught: question first, then give warnings, and then repeat the question `until I get the answer that she's already provided once.'"
[426 F.3d 221, 229-30 (3d Cir.2005).]
Seibert's conviction was overturned by the United States Supreme Court. A plurality of four justices examined the police interrogation technique, noting "[t]he technique of interrogating in successive, unwarned and warned phases raises a new challenge to Miranda." Seibert, supra, 542 U.S. at 609, 124 S.Ct. at 2608, 159 L.Ed.2d at 653. Justice Kennedy concurred, supplying the fifth vote necessary to overturn Seibert's conviction. Justice Souter, writing for the plurality emphasized that "attention must be paid to the conflicting objects of Miranda and question-first.. . . The object of question-first is to render Miranda warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." Id. at 611, 124 S.Ct. at 2609-10, 159 L.Ed.2d at 654. Justice Souter then instructed that just as Miranda does not require a "talismanic incantation[,]. . . it would be absurd to think that mere recitation of the litany suffices to satisfy Miranda in every conceivable circumstance." 542 U.S. at 611, 124 S.Ct. at 2610, 159 L.Ed.2d at 654-55 (internal quotation marks omitted). Justice Souter concluded:
The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effectively" as Miranda requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with Miranda, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.
[Seibert, 542 U.S. at 611-12, 124 S.Ct. at 2610, 159 L.Ed.2d at 655.]
The Third Circuit distilled the opinion of the Seibert plurality down to a five-factor test that courts should apply to determine the admissibility of a second confession given after the defendant has been Mirandized:
(1) "The completeness and detail of the questions and answers in the first round of interrogation";
(2) "The overlapping content of the two statements";
(3) "The timing and setting of the first and the second" rounds;
(4) "The continuity of police personnel"; and
(5) "The degree to which the interrogator's questions treated the second round as continuous with the first."
[United States v. Kiam, 432 F.3d 524, 532 (3d Cir.) (quoting Seibert, 542 U.S. at 615, 124 S.Ct. at 2612, 159 L.Ed.2d at 657), cert. denied, ___ U.S. ___, 126 S.Ct. 1453, 164 L.Ed.2d 149 (2006).]
In Justice Kennedy's concurrence in Seibert, he noted that the two-step technique was a deliberate violation of Miranda that "obscure[d] both the practical and legal significance" of the Miranda warnings when they were finally given to Seibert. 542 U.S. at 620, 124 S.Ct. at 2615, 159 L.Ed.2d at 660. Justice Kennedy also observed that the question-first method permits *503 the accused to conclude that she did not have the right not to respond to police questioning when making the "earlier incriminating statements." Ibid. Additionally, Justice Kennedy objected to the technique because the underlying police strategy is premised upon the assumption that Miranda warnings will "mean less" when recited midinterrogation, after the accused has already given an inculpatory statement to police. Ibid.
Further, Justice Kennedy expressed his disapproval of the tactic whereby the officer interrogating Seibert used her inadmissible inculpatory prewarning statement to extract a postwarning confession from her. 542 U.S. at 621, 124 S.Ct. at 2615, 159 L.Ed.2d at 661. The officer had asked Seibert postwarning: "[D]idn't you tell me he was supposed to die in his sleep?" Ibid. The question posed to Seibert referenced the inculpatory prewarning statement and "was an implicit suggestion that the mere repetition of the earlier statement was not independently incriminating. The implicit suggestion was false." Ibid. Justice Kennedy concluded "[t]he technique simply creates too high a risk that postwarning statements will be obtained when a suspect was deprived of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." Ibid. (internal quotation marks omitted).
Although Justice Kennedy concurred with the plurality that Seibert's conviction should be reversed, he outlined a different analytical framework for analyzing whether a second, postwarning confession is admissible:
In my view, [the plurality's] test cuts too broadly. Miranda's clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. Cf. Berkemer v. McCarty, 468 U.S. 420, 430, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the Miranda warning.
The admissibility of postwarning statements should continue to be governed by the principles of [Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)] unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver. For example, a substantial break in time and circumstances between the prewarning statement and the Miranda warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Cf. Westover v. United States, decided with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient. No curative steps were taken in this case, however, so the postwarning statements are inadmissible and the conviction cannot stand.
[Seibert, 542 U.S. at 622, 124 S.Ct. at 2616, 159 L.Ed.2d at 661-62 (Kennedy, J., concurring).]
Because Justice Kennedy concurred with the plurality on the narrowest grounds, the *504 reasoning expressed in his concurrence is the holding of the Court. Naranjo, supra, 426 F.3d at 231-32 (citing Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260, 266 (1977)).
In this case, Sergeant Luster and Detective Bava did not use a prewarning inculpatory statement from defendant to obtain a repeat or duplicate postwarning statement. Moreover, even if defendant should have been advised of his Miranda rights sooner, the record fully supports the trial court's finding that defendant gave his tape-recorded statements after he had knowingly, intelligently, and voluntarily waived his Miranda rights. This is not a case where defendant asserted his right to remain silent, or he invoked his right to counsel, and this is not a case where the police attempted to "undermine" defendant's Miranda warnings.
As noted in Seibert, when interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, it is likely that the warnings will be ineffective in preparing the suspect for successive interrogation, "close in time and similar in content." 542 U.S. at 613, 124 S.Ct. at 2610, 159 L.Ed.2d at 655. Here, however, the contents of defendant's statements were substantially different and the statements, taken at different times and locations, cannot be objectively viewed as a mere continuation of earlier questions and responses. Moreover, defendant has never testified that the Miranda warnings he received were inadequate or ineffective, and the record does not support his present claim. We therefore conclude that defendant's motion to suppress was correctly decided by the trial court. Elstad, supra, 470 U.S. at 318, 105 S.Ct. at 1298, 84 L.Ed.2d at 238 ("We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings."); State v. Brown, 282 N.J.Super. 538, 555, 660 A.2d 1221 (App.Div.) (finding defendant's second, written statement "could not be the fruit of a constitutional violation" and concluding "although it was error to admit the [initial] oral statement . . . it was proper for the trial court to refuse to suppress defendant's written statement."), certif. denied, 143 N.J. 322, 670 A.2d 1064 (1995).
Affirmed.