John E. Jones III, United States District Judge
Presently pending before the Court is Defendant Gary Bradley's Motion to Suppress physical evidence discovered by Trooper Wesley Johnson ("Trooper Johnson") as well as any statements Bradley made in connection therewith ("the Motion"). (Doc. 19). The facts of this case are not in dispute. Indeed, nearly the entire interaction was captured by a dashboard camera affixed to Trooper Johnson's patrol car and a microphone affixed to his uniform. The matter has been fully briefed, (Docs. 19, 20, 24, 35, 39), and is ripe for disposition. For the reasons that follow, the Motion shall be granted.
I. BACKGROUND
Trooper Johnson has been a trooper with the Pennsylvania State Police since May 31, 2015 and at all relevant times was assigned to the Troop H Incident Reaction Team. Trooper Johnson describes the Incident Reaction Team as a "proactive patrol unit focused on assisting local, state, or local task forces ... [with] crime patrol ... and local drug interdiction." (Doc. 30 at 4).
On February 10, 2018, Trooper Johnson was performing "aggressive patrol functions" in the Harrisburg area on Highway 81. (Id. at 5). At approximately 1:43 a.m., while parked in his unmarked patrol vehicle in the highway's median, Trooper Johnson noticed a silver Chevrolet sedan with Pennsylvania tags decrease its speed. This vehicle piqued Trooper Johnson's interest because, from his view, it seemed as if the driver was attempting to conceal his face as he drove by. (Id. at 6-8). Trooper Johnson later identified the driver of that vehicle as Defendant Gary Bradley ("Bradley" or "Defendant"). Because Trooper Johnson was suspicious that Bradley may have been attempting to conceal his face because he was driving under the influence ("DUI"), he pulled out from his perch, and trailed behind Bradley's vehicle. Trooper Johnson observed the Chevrolet weave and bob within its lane and clocked the vehicle at 75 miles-per-hour in a 65 miles-per-hour zone using his own vehicle's speedometer. At that point, Trooper Johnson believed that he had probable cause to stop the vehicle because Bradley's "driving behavior [was] potentially consistent with criminal activity." (Doc. 24-1). Accordingly, Trooper Johnson clicked on his emergency lights and initiated a traffic stop. As soon *463 as Trooper Johnson did so, the dash camera affixed to his patrol vehicle began recording. The dash camera collected audio through a microphone affixed to Trooper Johnson's uniform and video through a front-facing camera affixed to his vehicle. This video was submitted by both the Government and the Defendant as exhibits at the suppression hearing held in this matter.[1]
After pulling over to the side of the highway, Trooper Johnson approached the Chevrolet from the passenger side and observed Bradley sitting alone in the driver seat with several cell phones and cell-phone charging cords resting on the center console. Trooper Johnson noted that Bradley exhibited "several apparent signs of overt nervousness." (Doc. 30 at 13). Specifically, Trooper Johnson noticed "the tremoring of [Bradley's] voice" and hands "as he searched for his documents," that Bradley "appeared to look around the cabin as if he didn't know exactly what to do," and that Bradley was exhibiting "labored breathing that presented itself throughout the traffic stop." (Id. at 13-14). Trooper Johnson "categorize[d] Mr. Bradley in the top five nervous people that [he had] ever dealt with." (Id. at 14). At the suppression hearing, Bradley testified that his tremors are the result of a motorbike accident in 1988 and that Trooper Johnson neither asked him why his hands were shaking nor provided him with an opportunity to explain. (Id. at 60).
On approach, Trooper Johnson introduced himself and asked Bradley for his license, registration, and proof of insurance. Bradley informed Trooper Johnson that his license was suspended and that the vehicle was a rental but nonetheless provided Trooper Johnson with a state-issued ID and a copy of the vehicle's rental agreement. Trooper Johnson explained to Bradley that he pulled him over because he was bouncing within his lane and was driving too fast. Bradley told Trooper Johnson that he did not realize that he was weaving within his lane because he had been arguing with someone on the phone. Trooper Johnson tried to calm Bradley down, telling him to "take a deep breath." (Gov. Exh. 2 at 1:45).
Trooper Johnson then directed Bradley to accompany him to his patrol vehicle, stating "[l]isten, I'm going to bring you back to my car, okay, we'll see if I can check how many times you've been cited and stuff like that and if I can cut you a break. Okay?" (Id. ). Trooper Johnson continued, "just come on back to my car and we'll work it all out." (Id. ). Bradley acquiesced and exited his vehicle.
According to Trooper Johnson, although the practice of requesting that a driver leave their own vehicle is uncommon, he believed that speaking to Bradley in his patrol car, rather than on the side of the road, furthered his goal of "community[-]oriented policing" and provided an "opportunity to really explain to [Bradley] what we do and why we do it." (Doc. 30 at 15). Trooper Johnson averred that he learned this technique through interdiction classes offered by "Dessert Snow, Triple I Solutions" and "the Shield Initiative through the Pennsylvania State Police." (Id. at 16). Trooper Johnson explained at the suppression hearing that "obtaining or having a driver step out of his comfort zone and in his vehicle and moving them to *464 [the patrol] vehicle allows [the officer] to establish a better baseline in differentiating between the innocent motoring public and individuals engaged in criminal activity." (Id. at 17). Nonetheless, Trooper Johnson specified that he does not request the driver to exit the vehicle because he suspects contraband in the vehicle. (Id. at 18). Trooper Johnson estimated that he makes such a request in approximately 75 to 80 percent of traffic stops. (Id. at 17). At Bradley's state-court preliminary hearing held on February 22, 2018, however, Trooper Johnson offered an alternative explanation for his request; Trooper Johnson testified that he invited Bradley to sit in his vehicle "due to the temperature" and that it was not "appropriate to have him stand out in the cold." (Def. Exh. 104 at 9:00).
After Bradley exited his vehicle to accompany Trooper Johnson to his patrol car, Trooper Johnson asked Bradley for consent to pat him down for weapons. (Gov. Exh. 2 at 1:46). Bradley agreed. Trooper Johnson conducted a frisk, which did not reveal anything of note. Bradley then entered the front passenger door of Trooper Johnson's patrol vehicle.
Upon entering, Trooper Johnson began a query of Bradley's driver's license, criminal history, and driver's history using his patrol car's mobile computer. Almost instantly, Trooper Johnson proceeded to ask Bradley a barrage of additional questions. Trooper Johnson inquired as to whom Bradley was arguing with on the phone, about his travel plans, about the address listed on the vehicle's rental agreement, and about details concerning his family's whereabouts. Trooper Johnson also asked Bradley about his criminal history, including whether he had ever been in trouble with the law for anything besides his license suspension. Bradley informed Trooper Johnson that he had been in trouble for guns in 1998 and that he was under federal supervision as he awaited the start of an incarceration term after pleading guilty to conspiracy to possess heroin. Throughout the questioning-which spanned nearly ten minutes-Trooper Johnson pressed Bradley for details about his crimes and his sentence, for details about his mother and her whereabouts, his travel route, the renter of the vehicle, and the duration of the rental. Trooper Johnson also requested that Bradley provide him with contact information for the person listed on the rental agreement, which, according to Bradley, was his wife. (Gov. Exh. 2 at 1:46-1:54). Bradley answered all of Trooper Johnson's often-repetitive questions.
At one point, Trooper Johnson noted that the last time Bradley had been cited for a driving-related offense was in 2010.[2] Accordingly, Trooper Johnson informed Bradley that he would "cut him a break" by issuing him "a warning for the speed" and that he would not cite him for "bouncing over the line." (Gov. Exh. 2 at 1:54). Nonetheless, Trooper Johnson testified at the suppression hearing that, "[b]eing that I believed that criminal activity was afoot ... I wanted to confirm or dispel my suspicions at that point in time." (Doc. 30 at 27-28).
After explaining to Bradley that he would issue him only a warning, Trooper Johnson informed Bradley that his partner, Corporal Brian Hoye, had arrived. Corporal Hoye remained stationed directly outside of the front passenger side door-directly outside of where Bradley was sitting-and can be heard in the video announcing *465 himself by saying "how you doing, sir?" (Gov. Exh. 2 at 1:55). Trooper Johnson explained to Bradley that he called Corporal Hoye to the scene because "he does not like people up on his back." (Id. ). Trooper Johnson later testified at the suppression hearing that he requested backup because he intended to request Bradley's consent to search the vehicle and believed that a second unit was necessary to conduct that search. (Doc. 30 at 29). Trooper Johnson explained on cross-examination that "I was going to see how we needed to proceed, whether it was going to be a consent search, probable cause, or requesting a K-9 to the scene." (Id. at 54). Trooper Johnson also testified that, "[a]t that point in time," Bradley was "not free to leave," (Id. at 56; see also Def. Exh. 104 at 9:00), and that, in the event Bradley had not otherwise been arrested, Trooper Johnson would have impounded and inventory searched Bradley's vehicle as a result of Bradley's suspended license.
Within moments of Corporal Hoye's arrival, Trooper Johnson leveled his tone of voice and asked:
TROOPER JOHNSON: Gary, no guns in the car today?
BRADLEY: No.
TROOPER JOHNSON: Any marijuana in the car?
BRADLEY: No.
TROOPER JOHNSON: Any large sums of U.S. currency?
BRADLEY: No.
TROOPER JOHNSON: You know what I mean? No money?
BRADLEY: No.
TROOPER JOHNSON: Alright. No heroin?
BRADLEY: No.
TROOPER JOHNSON: Any cocaine?
BRADLEY: No.
TROOPER JOHNSON: Okay. What model is that Gary? ... Is that a Malibu?
BRADLEY: Yeah.
(Gov. Exh. 2 at 1:55).
At the suppression hearing, Trooper Johnson testified that he "notice[d] a deviation in the way [Bradley] responded" when he asked him about the cocaine. (Doc. 30 at 30). According to Trooper Johnson, Bradley's voice dropped "to nearly a whisper ... which was different from his prior responses." (Id. at 30). As such, Trooper Johnson asked additional follow up questions:
TROOPER JOHNSON: Gary, do you have anything illegal in that car whatsoever?
BRADLEY: Yeah, I do.
TROOPER JOHNSON: What do you have in there?
BRADLEY: I have some coke.
TROOPER JOHNSON: Some coke?
BRADLEY: Yes.
TROOPER JOHNSON: Okay. Listen, listen we'll work through it. Okay? Just bear with me, okay? I've been decent with you so far, haven't I?
BRADLEY: Yeah. Its helpful man.
TROOPER JOHNSON: So, listen, I'm going to read you your Miranda rights just because you're not free to leave, alright?
BRADLEY: Ok.
[Trooper Johnson recites Miranda warnings.]
TROOPER JOHNSON: How much cocaine is in the car?
[Although the video presented at the suppression hearing reveals a period of silence following this question, Trooper Johnson testified at the suppression hearing that Bradley "whispered to me that there was a lot." (Doc. 30 at 31-32).]
*466 TROOPER JOHNSON: Like a kilo or ounces?
[Silence]
TROOPER JOHNSON: Gary, I'm here for you brother.
BRADLEY: It's helpful man.
TROOPER JOHNSON: You just got sentenced, alright? Now, understand I'm here for you. Now help me out here. How much is in the car? A lot?
[Silence]
TROOPER JOHNSON: Okay. Just bear with me, alright?
[Trooper Johnson cuffs Bradley]
TROOPER JOHNSON: Where is the cocaine at in the car, Gary?
BRADLEY: In the trunk.
TROOPER JOHNSON: In the trunk? Okay.
TROOPER JOHNSON: How much coke are we talking, bud?
[Unintelligible sounds]
TROOPER JOHNSON: Huh? Like a Scarface pile?[3] That big?
[Silence]
TROOPER JOHNSON: Here. Hang tight. There you go.
(Gov. Exh. 2 at 1:55-1:57).
Trooper Johnson searched the trunk of Bradley's vehicle and discovered a vacuum-sealed kilogram of cocaine. A subsequent search of Bradley's person revealed a black notebook and a bundle of Unites States currency. (Doc. 30 at 32).
On July 11, 2018, the Government filed a single-count Indictment charging Bradley with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1). (Doc. 1). On November 11, 2018, Bradley filed the instant Motion to Suppress and a brief in support thereof. (Docs. 19, 20). The Government filed a brief in opposition under seal on November 15, 2018. (Docs. 23, 24, 26). On December 18, 2018, the Court held a suppression hearing at which Trooper Johnson and Bradley testified. Following that hearing, the Court ordered supplemental briefing. (Doc. 29). Bradley filed a supplemental brief in support of the Motion on February 4, 2019. (Doc. 35). The Government filed a supplemental brief in opposition on February 21, 2019. (Doc. 39). The matter has been fully briefed and is ripe for disposition. For the reasons that follow, the Motion shall be granted.
II. DISCUSSION
In his Motion and accompanying briefs, Bradley argues that, because Trooper Johnson subjected him to custodial interrogation without providing him Miranda warnings, his admission to having cocaine in the car prior to being Mirandized must be suppressed. Although Bradley acknowledges that he was not officially under arrest at the time he admitted to having the cocaine, he contends that his personal freedom was restrained to "the degree associated with a formal arrest." (Doc. 20 at 8 (citing California v. Beheler , 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) ) ). Bradley points out that he was confined to Trooper Johnson's patrol vehicle, that he was parked on the side of a busy highway, that it was the middle of the night, and that he was flanked by armed state troopers. (Doc. 35 at 17 (citing Berkemer v. McCarty , 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) ("[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.") ).
Likewise, Bradley contends, Trooper Johnson's questioning exceeded that which was necessary to effectuate the traffic stop *467 and issue a citation. Thus, Bradley reasons, Trooper Johnson's questions amounted to "interrogation" for purposes of Miranda . (Doc. 35 at 16 (citing Rhode Island v. Innis , 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (defining "interrogation" for Miranda purposes as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response") ). Accordingly, Bradley concludes, Trooper Johnson subjected him to custodial interrogation and his admission to having cocaine in the vehicle prior to being Mirandized as well as any evidence derived therefrom must be suppressed.
Moreover, Bradley argues, his subsequent post- Miranda admissions were coerced and must be suppressed under Oregon v. Elstad , 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) and Missouri v. Seibert , 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). Specifically, Bradley argues, his "removal ... from his own vehicle to that of the vehicle of Trooper Johnson, the arrival of another trooper, the absence of any other persons at the scene on [his] behalf ..., the fact [that he] was not visible to the fast-moving highway traffic on the dark, early morning of the traffic stop, and the continual questioning about his criminal past and the failure to accept his responses, all brought [him] to the point where this Court could conclude that his 'will was overborne.' " (Doc. 35 at 19 (citing Chavez v. Martinez , 538 U.S. 760, 769, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality) ). "Though not physically restrained and physically coerced," Bradley reasons, he was "involuntarily compelled to incriminate himself through 'psychological pressure.' " (Doc. 35 at 19 (citing Townsend v. Sain , 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) ). Accordingly, Bradley concludes, his post- Miranda admission and any evidence derived therefrom must also be suppressed.
In response, the Government argues that the cocaine and Bradley's admissions need not be suppressed because Bradley was never "in custody" such that Trooper Johnson was obligated to provide him with Miranda warnings. In support thereof, like Bradley, the Government relies upon Berkemer . In Berkemer , a police officer pulled over Defendant Berkemer for weaving in and out of traffic. The officer ordered Berkemer out of the car, observed signs of intoxication, and told him that he would not be allowed to leave the scene. Upon further questioning by police, Berkemer admitted to having consumed drugs and alcohol. Berkemer moved to suppress the admission because the officer had not provided him with Miranda warnings. The Supreme Court rejected Berkemer's position, holding that: "The roadside questioning of a motorist detained pursuant to a routine traffic stop does not constitute 'custodial interrogation' for the purposes of the Miranda rule." Berkemer , 468 U.S. at 421, 104 S.Ct. 3138. The Berkemer Court acknowledged that this was so because: (1) "[t]he vast majority of roadside detentions last only a few minutes;" (2) "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police;" and (3) "the typical traffic stop is public, at least to some degree ... [which] reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438, 104 S.Ct. 3138.
Relying upon Berkemer , the Government reasons in the instant case that Bradley's traffic stop was brief, was conducted on the side of a public road, and that only two police officers were present.
*468 Thus, the Government posits, just like in Berkemer , Bradley's traffic stop was non-custodial and Trooper Johnson was not obligated to Mirandize Bradley until after he was formally under arrest. Accordingly, the Government concludes, Bradley's pre- Miranda admission to having cocaine in the car need not be suppressed.
Moreover, the Government reasons, even if Bradley's pre- Miranda admissions are inadmissible, Bradley's post- Miranda admissions were voluntary and need not be suppressed. Specifically, the Government argues:
The failure of police to administer Miranda warnings does not mean that the statements received have actually been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. Absent deliberate coercion or improper tactics in obtaining an unwarned statement, a careful and thorough administration of Miranda warnings cures the condition that rendered the unwarned statement inadmissible. The warnings convey the relevant information, and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an act of free will.
Elstad , 470 U.S. at 298, 105 S.Ct. 1285 (1985). Here, the Government reasons, Trooper Johnson asked Bradley standard questions, he did not raise his voice, and he did not make physical contact with Bradley. Moreover, the Government points out, the entire traffic stop spanned only thirteen minutes. According to the Government, the fact that the interview was conducted in Trooper Johnson's vehicle-which Trooper Johnson identified as being his normal practice-was "not a calculated attempt to circumvent the defendant's rights." (Doc. 39 at 10). Therefore, even if Bradley's pre- Miranda admission must be suppressed, his post- Miranda admission was not coerced, and both the post- Miranda admission and the evidence derived therefrom need not be suppressed.
As a final argument, the Government proposes that, even if Bradley's statements are deemed inadmissible, the cocaine found in Bradley's car is admissible under the inevitable discovery doctrine. According to the Government, had Bradley not been arrested, and had he not otherwise consented to a search of his vehicle, Trooper Johnson had probable cause to bring in a canine unit to search the vehicle which would have inevitably resulted in Trooper Johnson finding the cocaine in Bradley's trunk. Moreover, the Government reasons, because Bradley was driving on a suspended license, Trooper Johnson was authorized to tow the vehicle and conduct an inventory search prior to impounding it, at which point the police would have inevitably discovered the cocaine. Thus, the Government concludes, even if Bradley's statements are inadmissible, the physical evidence discovered in the trunk of his car is admissible under the inevitable discovery doctrine. We disagree with all of the Government's positions.
It is well-settled that, prior to being subjected to custodial interrogation, "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." Miranda v. Arizona , 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ; Alston v. Redman , 34 F.3d 1237, 1244 (3d Cir. 1994). "[T]he determination of whether statements are the product of such 'custodial interrogation' must be made on a case-by-case basis." United States v. Leese , 176 F.3d 740, 743 (3d Cir. 1999).
A determination that a criminal suspect is "in custody" does not depend upon whether that suspect has been formally arrested, rather, a suspect is "in *469 custody" if his or her freedoms have been restrained to "the degree associated with a formal arrest," California v. Beheler , 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983), if "he or she has been 'deprived of his [or her] freedom of action in any significant way,' " United States v. Jacobs , 431 F.3d 99, 104 (3d Cir. 2005) (quoting Miranda , 384 U.S. at 444, 86 S.Ct. 1602 ), or if something is "said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." United States v. Willaman , 437 F.3d 354, 359 (3d Cir. 2006). Specifically, courts examine whether "a reasonable person would have believed that he [or she] was not free to leave." United States v. Mendenhall , 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).
However, "[n]ot all restraints on freedom of movement amount to custody for purposes of Miranda ." Howes v. Fields , 565 U.S. 499, 509, 132 S.Ct. 1181, 182 L.Ed.2d 17 (2012). Instead, courts must ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda " including: (1) whether the defendant consented to being interviewed, (2) whether the defendant was advised that he could decline to be questioned, (3) the duration of the interview, (4) whether the officers were armed, (5) whether the officers used physical threats or a sharp tone, and (6) the characteristics of the holding area (i.e. , size, lighting, comfortability, location). Id. at 509, 514-15, 132 S.Ct. 1181.
Moreover, a criminal suspect is said to have been subjected to "interrogation" for Miranda purposes when law enforcement use "any words or actions ... (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Innis , 446 U.S. at 301, 100 S.Ct. 1682. A "presumption of compulsion" attaches to an admission derived from an unwarned custodial interrogation and, generally, that admission and the fruits derived therefrom must be suppressed. Elstad , 470 U.S. at 306-307, 105 S.Ct. 1285.
Nonetheless, in a situation like the one sub judice where a criminal defendant makes an admission prior to being Mirandized , is then Mirandized , and then subsequently repeats or adds to the admission post- Miranda after continued police questioning, "the standard governing the admissibility of a post- Miranda -warning confession derived in part from [the pre-warning] interrogation varies on whether the [police officer's] initial failure to warn was deliberate or inadvertent." United States v. Shaird , 463 F. App'x 121, 123 (3d Cir. 2012) (citing United States v. Naranjo , 426 F.3d 221, 231-32 (3d Cir. 2005) ).
If the initial failure to warn [ ] was inadvertent, [t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.
"If [a] deliberate two-step strategy has been used, [post-warning] statements that are related to the substance of [pre-warning] statements must be excluded unless curative measures are taken before the [post-warning] statement is made." Such "[c]urative measures should be designed to ensure that a reasonable person in the suspect's situation would *470 understand the import and effect of the Miranda warning and of the Miranda waiver." This may include an inquiry into whether or not the defendant was informed that his/her prior unwarned statement cannot be used as evidence, although it's not necessary to inform the suspect of that in every instance.
Naranjo , 426 F.3d at 232 (first quoting Elstad , 470 U.S. at 318, 105 S.Ct. 1285, then quoting Seibert , 124 S.Ct. at 2616 (Kennedy, J. concurring) (alterations in original) ).
In determining whether the police have utilized a "deliberate two-step strategy," courts "review the totality of the objective and subjective evidence surrounding the interrogations in order to determine deliberateness." Charleston v. Gilmore , 305 F.Supp.3d 612, 627 (E.D. Pa. 2018) (quoting United States v. Capers , 627 F.3d 470, 479 (2d Cir. 2010) ; Shaird , 463 Fed.App'x. at 124 ) ). "Where credible subjective evidence of the officer's intent is available, it will 'of course be persuasive, and often decisive.' " Id. (quoting United States v. Moore , 670 F.3d 222, 230 n.3 (2d Cir. 2012) ; Shaird , 463 Fed.App'x. at 124 ). "But because such evidence often will be unavailable, 'in most instances, the inquiry will rely heavily, if not entirely, upon objective evidence.' " Id. (quoting Capers , 627 F.3d at 479 ). As to objective evidence, courts first consider whether the investigating officer knew or should have known that Miranda warnings were required and had not yet been given. Shaird , 463 Fed.App'x at 124. This consideration, however, is tempered by whether the officer's failure to warn was the result of a "rookie mistake." Naranjo , 426 F.3d at 232. Second, courts consider whether "the two interrogations were conducted in or around the police station, in close temporal proximity, and by the same officer." Shaird , 463 Fed.App'x at 124. As part of this factor, courts have not found the length of the interrogation, by itself, particularly convincing or dispositive as to deliberateness. Compare United States v. Young , 720 Fed.Appx. 846, 848-49 (9th Cir. 2017) (finding deliberate two-step strategy based upon only twenty minutes of questioning) with United States v. Street , 472 F.3d 1298, 1314 (11th Cir. 2006) (refusing to find deliberate two-step strategy when interrogation was "brief and general"). Third, courts consider whether police relied upon the suspect's pre-warning statements to obtain the post-warning statements. Seibert , 542 U.S. at 621, 124 S.Ct. 2601 (Kennedy, J., concurring) (finding officer's failure to give Miranda warnings deliberate where post- Miranda questioning "resembled a cross-examination" where the officer "confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them").
The Seibert plurality, which did not garner the support of Justice Kennedy's narrowing concurrence, found two additional factors convincing. First, the Seibert plurality considered "the completeness and detail of the questions and answers in the first round of interrogation." Seibert , 542 U.S. at 615, 124 S.Ct. 2601. "[W]here the pre-warning questioning is 'systematic, exhaustive, and managed with psychological skill,' as in Seibert , it is more likely that the omission of the Miranda warnings was deliberate." Charleston , 305 F.Supp.3d at 628 (quoting United States v. Aguilar , 384 F.3d 520, 525 (8th Cir. 2004) ). Indeed, in Bobby v. Dixon , the United States Supreme Court reiterated that, "[i]n Seibert , the suspect's first, unwarned interrogation left 'little, if anything, of incriminating potential left unsaid,' making it 'unnatural' not to 'repeat at the second stage what had been said before.' " 565 U.S. 23, 31, 132 S.Ct. 26, 181 L.Ed.2d 328 (2011) (quoting *471 Seibert , 542 U.S. at 616-17, 124 S.Ct. 2601 ). Moreover, the Seibert plurality considered "the overlapping content of the two statements" and "the degree to which the interrogator's questions treated the second round as continuous with the first." Seibert , 542 U.S. at 615-17, 124 S.Ct. 2601 (focusing upon the fact that the pre- Miranda and post- Miranda interrogations blended into one "continuum").
"Where ... an officer deliberately undermines the effectiveness of the Miranda warning by conducting an initial unwarned interrogation, the [post-warning] confession must be excluded unless appropriate curative measures were taken before the [post-warning] confession was made." Shaird , 463 Fed.App'x at 125 (citing Naranjo , 426 F.3d at 232 ). Appropriate "curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver." Seibert , 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring). Possible curative steps include a "substantial break in time and circumstances between the [pre-warning] statement and the Miranda warning" as well as an explanation by the officer that the pre- Miranda admission may be inadmissible, though this latter curative step is not always necessary. See Seibert , 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring).
In the instant case, we find that, from at least the time that Corporal Hoye arrived at the scene, Bradley was inarguably subject to custodial interrogation and that Trooper Johnson clearly should have provided him with Miranda warnings. Accordingly, any admission Bradley made between Corporal Hoye's arrival and Trooper Johnson's issuance of Miranda warnings must be suppressed.
Although Bradley had not yet been formally arrested at the time Corporal Hoye arrived at the scene, he was certainly restrained to "the degree associated with a formal arrest." Beheler , 463 U.S. at 1125, 103 S.Ct. 3517. Indeed, the record reveals that, according to Trooper Johnson, Bradley was, in fact, not free to leave. (Doc. 30 at 28, 56; Def. Exh. 104 at 9:00). Moreover, the totality of the circumstances reflects the same "inherently coercive pressures as the type of station house questioning at issue in Miranda ." Howes , 565 U.S. at 509, 514-15, 132 S.Ct. 1181. First, Bradley was confined to Trooper Johnson's patrol vehicle on Trooper Johnson's orders. Trooper Johnson admitted that he directed Bradley to join him in his patrol vehicle to probe whether Bradley was "engaged in criminal activity." (Doc. 30 at 16). Although Bradley did not specifically object, he only consented to the confinement inasmuch as he was following Trooper Johnson's authoritative directions. Indeed, at no point did Trooper Johnson advise Bradley that he could decline his invitation or that he was free to go back to his own vehicle-a consideration that the Howes Court noted was suggestive of a Miranda obligation. See Howes , 565 U.S. at 509, 514-15, 132 S.Ct. 1181. Second, Bradley was bookended by armed state troopers. To Bradley's left sat Trooper Johnson. To his right-directly outside the door which Bradley could have theoretically used to exit-stood Corporal Hoye. It is hard to imagine a situation where Trooper Johnson and Corporal Hoye would have allowed Bradley to simply open the door and walk away. Third, the characteristics of the holding area suggest that Bradley was in custody for purposes of Miranda . The whole interaction occurred in the middle of the night, on the side of a bustling highway with cars passing at 65 miles-per-hour. Trooper Johnson had confined Bradley to the front seat of his vehicle and positioned a second armed trooper directly *472 outside. The emergency lights of Trooper Johnson's vehicle remained flashing throughout the interaction. Together, these characteristics manifestly created a highly stressful and unhospitable environment. Accordingly, we find that, at least from the time Corporal Hoye arrived on the scene, Bradley was subject to "the same inherently coercive pressures as the type of station house questioning at issue in Miranda ," that a reasonable person in Bradley's situation would not have felt free to leave, and that Bradley was thus "in custody" for Miranda purposes.
Although we acknowledge that Trooper Johnson and Corporal Hoye did not physically threaten Bradley or use a sharp tone of voice, we are unconvinced by the Government's position that the absence of such behavior merits a finding that Bradley was not "in custody." Indeed, had the troopers physically threatened Bradley or used a sharp tone, Trooper Johnson's more subtle psychological strategy may have been compromised. "We cannot reach a conclusion simply by scrutinizing each circumstance separately, for the concept underlying the phrase 'totality of the circumstances' is that the whole is somehow distinct from the sum of the parts." Miller v. Fenton , 796 F.2d 598, 605 (3d Cir. 1986). Accordingly, the troopers' choice not to use physical violence or a harsh tone does not undercut our finding that Bradley was "in custody" for purposes of Miranda .
We also find that Trooper Johnson was "interrogating" Bradley for purposes of Miranda. It is clear to us that Trooper Johnson used "words or actions ... (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Innis , 446 U.S. at 301, 100 S.Ct. 1682. First, even though the instant seizure was a simple traffic stop, Trooper Johnson asked Bradley a litany of questions about his travel plans, his family, and his criminal history. After each answer, Trooper Johnson repeated questions and dug deeper with pointed follow up. Then, after Corporal Hoye arrived, Trooper Johnson rattled off a sequence of probing questions, each designed to elicit a damning response. In fact, Trooper Johnson testified at the suppression hearing that he leveled the tone of his voice to help him identify whether the tone of Bradley's voice would betray him. (Doc. 30 at 29-30 ("They're what we refer to as clarifying questions. We attempt to ask them in a level tone in order to assess if there's any deviation based upon response from the individual, in this case Mr. Bradley, whether it's looking for specific substances that we may be dealing with, either the mentioned substances here, fentanyl, for officer safety concerns or if it's firearms that we're potentially looking at, I'm trying to narrow down what type of criminal activity that I'm dealing with and how I need to proceed."). In our view, the only reason Trooper Johnson questioned Bradley in the way he did was to "elicit an incriminating response." See Innis , 446 U.S. at 301, 100 S.Ct. 1682. Thus, we find that Bradley was subject to "interrogation" for purposes of Miranda .
To reiterate, because we find that Bradley was "in custody" and subject to "interrogation," we find that Trooper Johnson was obligated to provide Bradley with Miranda warning from at least the time that Corporal Hoye arrived on the scene. Because Trooper Johnson failed to do so until later in the interaction, we find that all statements Bradley made prior to being Mirandized must be suppressed. Elstad , 470 U.S. at 306-307, 105 S.Ct. 1285 ("[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded *473 from evidence under Miranda . Thus, in the individual case, Miranda's preventive medicine provides a remedy even to the defendant who has suffered no identifiable constitutional harm.").
However, this finding does not end our inquiry. Because Trooper Johnson Mirandized Bradley, after which Bradley admitted the location and quantity of cocaine in his car, we next consider the critical issue of whether Bradley's post- Miranda admission must also be suppressed. For the reasons discussed infra , we find that Trooper Johnson's initial failure to warn Bradley was deliberate. Thus, we conclude that the instant case is controlled by Seibert . As such, and because Trooper Johnson neglected to cure his failure to administer Miranda warnings, and because Bradley's post- Miranda admission was inextricably intertwined with, and derived from, his pre- Miranda admission, Bradley's post- Miranda admission must also be suppressed.
Trooper Johnson testified that he had been with the Pennsylvania State Police for almost three years at the time he pulled Bradley over. Thus, Trooper Johnson was neither a "rookie" nor did he testify that his failure to warn Bradley was accidental. See Naranjo , 426 F.3d at 232. Because of his experience, Bradley should have known that subjecting a suspect to custodial interrogation necessitates Miranda warnings. See Shaird , 463 Fed.App'x at 124. Thus, Trooper Johnson should have recognized that, confining Bradley to his patrol vehicle on the side of the road, in the middle of the night, flanking him with armed state troopers, and then subjecting him to a litany of questions designed to elicit an incriminating response was sufficient to trigger his obligation to provide Bradley with Miranda warnings. Furthermore, as noted in Shaird , the pre- Miranda and post- Miranda interrogations at issue in this case were conducted back to back, under custodial conditions, by the same officer. See id.
We are unpersuaded by the Government's contention that the length of Trooper Johnson's questioning resolves whether Trooper Johnson's failure to give Miranda warnings was deliberate. Although the length of the interrogation is a consideration in determining whether a failure to warn is deliberate, it is not dispositive. Compare Young , 720 Fed.Appx. at 848-49 (finding deliberate two-step strategy based upon only twenty minutes of questioning) with Street , 472 F.3d at 1314 (refusing to find deliberate two-step strategy when interrogation was "brief and general").
The record also reveals that Trooper Johnson relied upon Bradley's pre-warning statements to obtain the post-warning statements. See Seibert , 542 U.S. at 621, 124 S.Ct. 2601 (Kennedy, J., concurring). Here, Trooper Johnson admitted at the suppression hearing that the only reason he asked Bradley the follow-up catch-all question of "do you have anything illegal in that car whatsoever" which resulted in Bradley's pre- Miranda admission that he had cocaine in the car was because Bradley's voice had dropped "to nearly a whisper" when Trooper Johnson asked him whether he had cocaine in the car. (Doc. 30 at 31-32). Furthermore, Bradley's incriminating post- Miranda admission that he had "a lot" of cocaine stemmed from Trooper Johnson's suggestion to Bradley that he already knew that the cocaine was in the car vis-à-vis his leading question "[h]ow much cocaine is in the car?" (Gov. Exh. 2 at 1:55-1:57). Likewise, Bradley's other incriminating post- Miranda admission that the cocaine was in the trunk was the result of Bradley's pre- Miranda statement that Bradley had just been sentenced. (Gov. Exh. 2 at 1:55-1:57) ("You just got sentenced, alright? Now, understand *474 I'm here for you. Now help me out here. How much is in the car? A lot?"). Therefore, it is clear that Trooper Johnson presented Bradley with his pre- Miranda statements in an effort to elicit incriminating responses post- Miranda . In many ways, Trooper Johnson's leading questions "resembled a cross-examination." See Seibert , 542 U.S. at 615, 124 S.Ct. 2601. Likewise, Trooper Johnson "confronted" Bradley with his "inadmissible prewarning statements and pushed [him] to acknowledge them" by only a nod of his head. See id.
Finally, the fact that Trooper Johnson asked his questions systematically, exhaustively, and with psychological skill suggests that his failure to provide Bradley with Miranda warnings was indeed deliberate. Trooper Johnson leveled the tone of his voice and carefully evaluated each of Bradley's answers to his exhaustive list of potential contraband. Noticing a slight change in Bradley's voice, Trooper Johnson pounced and asked a sequence of follow-up questions. In turn, Trooper Johnson's "unwarned interrogation left 'little, if anything, of incriminating potential left unsaid,' making it 'unnatural' not to 'repeat at the second stage what had been said before.' " Bobby v. Dixon , 565 U.S. 23, 31, 132 S.Ct. 26, 181 L.Ed.2d 328 (2011) (quoting Seibert , 542 U.S. at 616-17, 124 S.Ct. 2601 ). That is, it would have been almost absurd for Bradley to deny that he had contraband in the vehicle after having admitted as much seconds earlier. Thus, "the completeness and detail of the questions and answers in the first round of interrogation," "the overlapping content of the two statements," and "the degree to which the interrogator's questions treated the second round as continuous with the first" all suggest that Trooper Johnson's failure to Mirandize Bradley was deliberate. Accordingly, and for the various other aforementioned reasons, we find that Trooper Johnson's failure to advise Bradley of his Miranda rights was, in fact, deliberate and that this case is controlled by Justice Kennedy's narrowing concurrence in Seibert .
Because we so find, we next evaluate whether Trooper Johnson provided appropriate "curative measures ... designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the Miranda warning and of the Miranda waiver." Seibert , 542 U.S. at 622, 124 S.Ct. 2601 (Kennedy, J., concurring). We find that he did not. In this case, Trooper Johnson failed to provide any explanation to Bradley of his Miranda rights or explain that his pre- Miranda admission may not be admissible against him. Moreover, Trooper Johnson raced through the Miranda warning in a fashion similar to the disclaimer at the end of a prescription drug commercial, thereby further obfuscating its effectiveness. Accordingly, because Trooper Johnson "deliberately undermine[d] the effectiveness of the Miranda warning by conducting an initial unwarned interrogation" and then failed to provide any sort of "curative measures," we find that "the [post-warning] confession must be excluded." See Shaird , 463 Fed.App'x at 125 (citing Naranjo , 426 F.3d at 232 ).
Alternatively, even were we disinclined to conclude that Trooper Johnson's failure to Mirandize Bradley was deliberate, we find that Bradley's post- Miranda admission was coerced and must be suppressed under Elstad notwithstanding Trooper Johnson's technical administration of Miranda warnings. According to Bradley, his "removal ... from his own vehicle to that of the vehicle of Trooper Johnson, the arrival of another trooper, the absence of any other persons at the scene on [his] behalf ..., the fact [that he] was not visible to the fast-moving highway traffic on *475 the dark, early morning of the traffic stop, and the continual questioning about his criminal past and the failure to accept his responses, all brought [him] to the point where this Court could conclude that his 'will was overborne.' " (Doc. 35 at 19 (citing Chavez v. Martinez , 538 U.S. 760, 769, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003) (plurality) ). "Though not physically restrained and physically coerced," Bradley reasons, he was "involuntarily compelled to incriminate himself through 'psychological pressure.' " (Doc. 35 at 19 (citing Townsend v. Sain , 372 U.S. 293, 307, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) ). We agree.
Courts examine the totality of the circumstances when evaluating the voluntariness of a statement. Schneckloth v. Bustamonte , 412 U.S. 218, 226, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "It is well established that an involuntary confession may result from psychological, as well as physical, coercion." Miller , 796 F.2d at 603. "The question in each case is whether the defendant's will was overborne when he confessed." Id. at 604. "The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused." Haynes v. Washington , 373 U.S. 503, 515, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963). Factors that courts consider in evaluating whether a suspect's will was overborne as a result of psychological pressure include "the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep," Schneckloth , 412 U.S. at 226, 93 S.Ct. 2041, as well as "[a] suspect's ... prior dealings with the criminal justice system," Oregon v. Bradshaw , 462 U.S. 1039, 1046, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983) (plurality opinion); United States v. Velasquez , 885 F.2d 1076, 1086 (3d Cir. 1989), "the specific tactics utilized by the police in eliciting the admissions," and "the details of the interrogation." Miller , 796 F.2d at 604 (quoting Rachlin v. United States , 723 F.2d 1373, 1377 (8th Cir.1983) ). Because, however, "it is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect" and "[f]ew criminals feel impelled to confess to the police purely of their own accord, without any questioning at all," the relevant question when determining voluntariness is "not whether [Trooper Johnson's] statements were the cause of [Bradley's] confession-indeed, we assume that to be the case-but whether those statements were so manipulative or coercive that they deprived [Bradley] of his ability to make an unconstrained, autonomous decision to confess." Id. Because we find that Trooper Johnson's statements and actions were so coercive that they deprived Bradley of his ability to make an unconstrained decision to confess, we hold that Bradley's post- Miranda admissions concerning the cocaine in his car must be suppressed as involuntary.
In the instant case, at the time of his post- Miranda admission, Bradley was confined to a police car and was flanked by armed state troopers. Bradley was driving a rental car, in the middle of the night, and was pulled over on the side of a busy highway. As aforestated, cars were whizzing by at 65 miles-per-hour. Trooper Johnson's emergency lights were flashing, it was cold outside, and Bradley was wearing only slippers. For Bradley, these factors could only have created an unhospitable, *476 highly stressful, and confusing emotional experience. Capitalizing on this, Trooper Johnson exhibited an overly-friendly demeanor designed to set Bradley at ease, see Miller , 796 F.2d at 607, and, on more than one occasion, Trooper Johnson implied to Bradley that, if he cooperated, he would "be[ ] good to him" and "cut him a break." Trooper Johnson also emphasized to Bradley "I'm here for you brother ... understand I'm here for you. Now help me out here." (Gov. Exh. 2 at 1:55-1:57). Nonetheless, as noted in Miller , "the test for voluntariness is not a but-for test, but a question of whether the confession was a product of free choice." Miller , 796 F.2d at 613. Combining the above-referenced nature of the interrogation with Trooper Johnson's deliberate failure to provide Bradley with Miranda warnings and the inherent pressure imposed upon Bradley when Trooper Johnson used his otherwise-inadmissible pre- Miranda admission to elicit Bradley's subsequent admissions at issue today, we find that Bradley's will was overborne and his post- Miranda admissions must be suppressed as a product of coercion. Indeed, as we have already noted, Trooper's Johnson initial line of questioning and Bradley's responses thereto made "it 'unnatural' not to 'repeat at the second stage what had been said before.' " Bobby , 565 U.S. at 31, 132 S.Ct. 26 (quoting Seibert , 542 U.S. at 616-17, 124 S.Ct. 2601 ).
We acknowledge that the simple fact that Trooper Johnson deliberately set up Bradley to make an incriminating statement prior to being Mirandized and then manipulated him into repeating that admission after warning him is insufficient, in and of itself, to warrant a finding that Bradley's post- Miranda admission was involuntary. See Elstad , 470 U.S. at 317-18, 105 S.Ct. 1285. Nonetheless, we also acknowledge that "deliberately coercive or improper tactics" warrant suppression. Elstad , 470 U.S. at 314, 105 S.Ct. 1285. Based upon the totality of the circumstances in this case, it is clear to us that Bradley's will was overborn by a host of factors including the conditions of his interrogation, Trooper Johnson's demeanor, Trooper Johnson's deliberate refusal to give him Miranda warnings, and Trooper Johnson's reliance upon Bradley's unwarned admission to elicit his second admission. Although the interaction between Bradley and Trooper Johnson does not have all of the features of a traditionally involuntary statement (i.e. , prolonged questioning, physical punishment) and Bradley has not contended that his age, education, intelligence, and prior dealings with the criminal justice system bear on whether Trooper Johnson's tactics overbore his will, we find that the totality of the circumstances in this case reveals that Bradley's post- Miranda admission was coerced and involuntary. Accordingly, Bradley's post- Miranda statements concerning the quantity and location of the cocaine in his car and the cocaine discovered as a result of that admission must be suppressed on that basis.
In closing, we note that, because Bradley's pre- Miranda and post- Miranda admissions must both be suppressed, the physical evidence derived as a result of those statements must also be suppressed. Wong Sun v. United States , 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We reject the Government's last-ditch, cursory effort to admit the cocaine discovered in Bradley's trunk under the inevitable discovery doctrine. Adopted by the United States Supreme Court in Nix v. Williams , 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the inevitable discovery doctrine provides that evidence obtained as a result of an unlawful search need not be suppressed "[i]f the prosecution can establish *477 by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." United States v. Vasquez De Reyes , 149 F.3d 192, 195 (3d Cir. 1998). "It is the government's burden to show that the evidence at issue would have been acquired through lawful means, a burden that can be met if the government establishes that the police, following routine procedures, would inevitably have uncovered the evidence." Id. "However, the Supreme Court made clear in Nix that the analysis should focus upon the historical facts capable of ready verification, and not speculation." Id. (citing Nix , 467 U.S. at 444 n.5, 104 S.Ct. 2501 ). "Speculation and assumption do not satisfy the dictates of Nix ... [i]nevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof." Id. (quoting United States v. Jones , 72 F.3d 1324, 1334 (7th Cir.1995) ).
Trooper Johnson's bald assertions that he had probable cause to conduct a canine search which would have in turn revealed the cocaine and that he would have towed Bradley's car and conducted an inventory search which would have revealed the cocaine are insufficient to carry the Government's burden to show that "the evidence at issue would have been acquired through lawful means." See id. The simple fact that Bradley may have had probable cause to call a canine to the scene to sniff the vehicle does not mean that he would have done so as a matter of course. Likewise, even if a canine had arrived on the scene, it is not certain that the canine would have inevitably alerted on the trunk and/or discovered the cocaine.
The Government's contention that the inventory search would have inevitably revealed the cocaine suffers from the same defect. At the suppression hearing, Trooper Johnson noted only that, because Bradley was driving on a suspended license, he would not have let him drive away. (Doc. 30 at 28). Then, Trooper Johnson posited that Bradley's vehicle would have been towed and "[d]ue to our policy we would have conducted an inventory of the vehicle as well as contacted the individual that was on the rental agreement." (Doc. 30 at 28). According to Trooper Johnson, that search "would have involved a check of the vehicle to ensure that there were no valuables, to remove them and/or document them. If we had to remove some of them from the vehicle they would be logged into our evidence room, and that would be with our policy and our conversation with the operator of the vehicle." (Id. ). Despite Trooper Johnson's assertions as to the policies underlying the inventory search, Trooper Johnson did not aver that protocol mandated that he tow and inventory Bradley's vehicle as a result of his suspended license. See United States v. Humphries , 2004 WL 2743432, at *6 (E.D. Pa. Nov. 29, 2004) ("The record before the Court establishes that the Philadelphia Police Department had a pre-existing policy that an inventory search can be conducted on all vehicles seized from persons driving with suspended licenses."). Trooper Johnson could have asked Bradley to contact someone to come drive the vehicle home or could have allowed Bradley to drive home on the condition that he avoid driving again until his license was reinstated. This would be consistent with Trooper Johnson's statements to Bradley that he would "cut him a break." (Gov. Exh. 2 at 1:54). Thus, the Government has failed to carry its burden to demonstrate that "the police, following routine procedures, would inevitably have uncovered the evidence" based "upon the historical facts capable of ready verification, *478 and not speculation." Id. (citing Nix , 467 U.S. at 444 n.5, 104 S.Ct. 2501 ). Aside from a general citation to Nix and citations to cases which do not discuss the inevitable discovery doctrine, the Government has failed to cite a single case in which the inevitable discovery doctrine served to admit otherwise-inadmissible evidence under facts similar to those before us. As our Court of Appeals noted in Vasquez De Reyes , "[i]nevitable discovery is not an exception to be invoked casually, and if it is to be prevented from swallowing the Fourth Amendment and the exclusionary rule, courts must take care to hold the government to its burden of proof." Id. (quoting United States v. Jones , 72 F.3d 1324, 1334 (7th Cir.1995) ).
Because we shall suppress Bradley's admissions as well as the evidence discovered therefrom and because we reject the Government's alternative bases to admit the cocaine, we do not address Bradley's alternative arguments for suppression.[4]
III. CONCLUSION
In accordance with the foregoing, Defendant Gary Bradley's motion to suppress shall be granted.
NOW, THEREFORE, IT IS HEREBY ORDERED:
1. Defendants' Motion to Suppress, (Doc. 19), is GRANTED .

The Government offers the video and audio recording captured by Trooper Johnson's dash cam as Government Exhibit 2. Defendant offers the same video as Defense Exhibit 102. Because the Defense version of the video cuts off earlier than the Government's video, we use the time-stamps provided in the Government's version. All time-stamp citations to statements quoted in this memorandum are approximate within one minute.

At the suppression hearing, Trooper Johnson noted that, "[u]pon reviewing his driver's history at a later date I did observe an additional citation for driving under suspension in 2017." (Doc. 30 at 25).

Trooper Johnson was evidently referencing the 1983 American crime film Scarface .

Bradley also argues that Trooper Johnson prolonged his detention beyond that which is allowable during a routine traffic stop without reasonable suspicion and that, the evidence obtained because of that unconstitutionally elongated detention, including the cocaine and any admission in connection therewith, must be suppressed. Moreover, Bradley contends that, because Trooper Johnson did not provide Miranda warnings prior to his admission that there was cocaine in the vehicle, that confession could not amount to probable cause to search the vehicle. Thus, because Trooper Johnson neither received Bradley's consent to search the vehicle nor obtained a search warrant to do so, Trooper Johnson's warrantless search was unconstitutional, and the evidence obtained therefrom must be suppressed.